UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:18-cv-23431-JEM

JONNATHAN RAMOS,
individually and on behalf of all
others similarly situated,         **CLASS ACTION**

    Plaintiff,         **JURY TRIAL DEMANDED**

v.

PF HOMESTEAD, LLC d/b/a PLANET
FITNESS – HOMESTEAD,

    Defendant.
_____/

**SECOND AMENDED CLASS ACTION COMPLAINT**[1]

Plaintiff Jonnathan Ramos brings this class action against Defendant PF Homestead, LLC d/b/a Planet Fitness - Homestead and alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

**NATURE OF THE ACTION**

1.    This is a putative class action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*, ("TCPA"), arising from Defendant's knowing and willful violations of the TCPA.

2.    Defendant owns and operates a fitness center in Homestead, Florida.

3.    Defendant uses text messages as a means of marketing its business and promoting sales to prior customers who have since cancelled their membership.

---

[1] Pursuant to Federal Rule of Civil Procedure 15(a)(2), this amended pleading is filed with Defendant's consent.

1

4. As a result of Defendant's actions, Defendant caused thousands of unsolicited text messages to be sent to the cellular telephones of Plaintiff and Class Members, causing them injuries, including invasion of their privacy, aggravation, annoyance, intrusion on seclusion, trespass, and conversion.

5. Through this action, Plaintiff seeks injunctive relief to halt Defendant's illegal conduct. Plaintiff also seeks statutory damages on behalf of himself and Class Members, as defined below, and any other available legal or equitable remedies resulting from the illegal actions of Defendant.

## JURISDICTION AND VENUE

6. Jurisdiction is proper under 28 U.S.C. § 1331 as Plaintiff alleges violations of a federal statute. Jurisdiction is also proper under 28 U.S.C. § 1332(d)(2) because Plaintiff alleges a national class, which will result in at least one Class member belonging to a different state than Defendant. Plaintiff seeks up to $1,500.00 in damages for each call in violation of the TCPA, which, when aggregated among a proposed class numbering in the tens of thousands, or more, exceeds the $5,000,000.00 threshold for federal court jurisdiction under the Class Action Fairness Act ("CAFA").

7. Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants are deemed to reside in any judicial district in which it is subject to the court's personal jurisdiction, and because Defendant provides and markets its services within this district thereby establishing sufficient contacts to subject it to personal jurisdiction. Further, on information and belief, Defendant has sent the same text message complained of by Plaintiff to other individuals within this judicial district, such that some of Defendant's acts have occurred within this district, subjecting Defendant to jurisdiction here.

## PARTIES

8. Plaintiff is a natural person who, at all times relevant to this action, was a resident of

Volusia County, Florida.

9. Defendant's principal address is located at 2620 NE 10th Ct., Homestead, FL 33033. Defendant directs, markets, and provides business activities throughout the State of Florida.

## THE TCPA

10. The TCPA prohibits: (1) any person from calling a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent. 47 U.S.C. § 227(b)(1)(A).

11. The TCPA defines an "automatic telephone dialing system" ("ATDS") as "equipment that has the capacity - (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

12. The TCPA exists to prevent communications like the ones described within this Complaint. *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

13. In an action under the TCPA, a plaintiff must show only that the defendant "called a number assigned to a cellular telephone service using an automatic dialing system or prerecorded voice." *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012), *aff'd*, 755 F.3d 1265 (11th Cir. 2014).

14. The Federal Communications Commission ("FCC") is empowered to issue rules and regulations implementing the TCPA. According to the FCC's findings, calls in violation of the TCPA are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient. The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.

15. In 2012, the FCC issued an order further restricting automated telemarketing calls,

requiring "prior express written consent" for such calls to wireless numbers. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830, 1838 ¶ 20 (Feb. 15, 2012) (emphasis supplied).

16. To obtain express written consent for telemarketing calls, a defendant must establish that it secured the plaintiff's signature in a form that gives the plaintiff a "'clear and conspicuous disclosure' of the consequences of providing the requested consent….and [the plaintiff] having received this information, agrees unambiguously to receive such calls at a telephone number the [plaintiff] designates." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.R. 1830, 1837 ¶ 18, 1838 ¶ 20, 1844 ¶ 33, 1857 ¶ 66, 1858 ¶ 71 (F.C.C. Feb. 15, 2012).

17. The TCPA regulations promulgated by the FCC define "telemarketing" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 C.F.R. § 64.1200(f)(12). In determining whether a communication constitutes telemarketing, a court must evaluate the ultimate purpose of the communication. *See Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015).

18. "Neither the TCPA nor its implementing regulations 'require an explicit mention of a good, product, or service' where the implication of an improper purpose is 'clear from the context.'" *Id*. (citing *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012)).

19. "'Telemarketing' occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services." *Golan*, 788 F.3d at 820 (citing 47 C.F.R. § 64.1200(a)(2)(iii) & 47 C.F.R. § 64.1200(f)(12)); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C. Rcd at 14098 ¶ 141, 2003 WL 21517853, at *49).

20. The FCC has explained that calls motivated in part by the intent to sell property, goods,

or services are considered telemarketing under the TCPA. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶¶ 139-142 (2003). This is true whether call recipients are encouraged to purchase, rent, or invest in property, goods, or services during the call *or in the future*. *Id*.

21. In other words, offers "that are part of an overall marketing campaign to sell property, goods, or services constitute" telemarketing under the TCPA. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶ 136 (2003).

22. If a call is not deemed telemarketing, a defendant must nevertheless demonstrate that it obtained the plaintiff's prior express consent. *See In the Matter of Rules and Regulaions Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7991-92 (2015) (requiring express consent "for non-telemarketing and non-advertising calls").

23. Further, the FCC has issued rulings and clarified that consumers are entitled to the same consent-based protections for text messages as they are for calls to wireless numbers. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) (The FCC has determined that a text message falls within the meaning of "to make any call" in 47 U.S.C. § 227(b)(1)(A)); *Toney v. Quality Res., Inc.*, 2014 WL 6757978, at *3 (N.D. Ill. Dec. 1, 2014) (Defendant bears the burden of showing that it obtained Plaintiff's prior express consent before sending him the text message). (emphasis added).

24. As held by the United States Court of Appeals for the Ninth Circuit: "Unsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients. A plaintiff alleging a violation under the TCPA 'need not allege any additional harm beyond the one Congress has identified.'" *Van Patten v. Vertical Fitness Grp.*, No. 14-55980, 2017 U.S. App. LEXIS 1591, at *12 (9th Cir. May 4, 2016) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540,

5

1549 (2016) (emphasis original)).

## FACTS

25. On or about December 1, 2015, Plaintiff became a member of Defendant's fitness facility by signing a membership agreement ("Membership Agreement").

26. In 2018, Plaintiff cancelled his fitness membership with Defendant. At the time of cancelling his account, Plaintiff did not have an outstanding balance on his membership account with Defendant.

27. After Plaintiff cancelled his Membership Agreement with Defendant, on August 10, 2018, Defendant caused an automated text message to be transmitted to Plaintiff's cellular telephone number ending in 7547 ("7547 Number"):



28. The text message constitutes telemarketing/advertising because it promotes Defendant's fitness facility.

29. Specifically, the text message states "[w]e're making it easier than ever to come back to PF. For a limited time you can rejoin for $1 Down and get ONE MONTH FREE."

30. The text message also offers the use of two different promotional codes for additional discounts on a membership at Defendant's fitness facility.

31. Additionally, the hyperlink within the text message routes to a website ( the "Website")

copied below, which is owned and/or operated by Defendant:

**HOMESTEAD, FL MEMBERSHIPS**
Select the membership that works best for you to get you started!

**Location:** Homestead, FL

| Select the right membership for you | CLASSIC | BEST VALUE — BLACK CARD | NO COMMITMENT |
|---|---|---|---|
| | BACK TO SCHOOL SPECIAL! | $1 DOWN – BLACK CARD! | NO COMMITMENT! NO CATCHES! NO KIDDING! |
| | $10.00/MO | $21.99/MO | $15.00/MO |
| | Low $1.00 Startup Fee. Offer Expires August 15th! | Low $1.00 Startup Fee. Offer Expires August 15th! | No commitment! Low $49.00 Startup Fee. Offer Expires August 31st! |
| | Join Now | Join Now | Join Now |
| Unlimited Access to Home Club | ✓ | ✓ | ✓ |
| Free Fitness Training | ✓ | ✓ | ✓ |
| Reciprocal use of all Planet Fitness® Franchise Locations | — | ✓ | — |
| Unlimited Guest Privileges at All Planet Fitness Locations | — | ✓ | — |
| Unlimited Use of Hydromassage | — | ✓ | — |
| Use of Tanning | — | ✓ | — |
| Unlimited Use of Massage Chairs | — | ✓ | — |
| 1/2 Price Cooler Drinks (Restrictions may apply) | — | ✓ | — |
| PF Black Card Key Tag | — | ✓ | — |
| 20% off Reebok products | — | ✓ | — |
| WiFi | — | ✓ | — |
| Terms & Conditions: | Plus applicable taxes. Billed monthly to a checking account. Annual Membership Fee of $39.00 plus applicable taxes will be billed on or shortly after October 1st. Membership can only be used at this location. This offer requires a 12 month commitment. | Plus applicable taxes. Billed monthly to a checking account. Annual Membership Fee of $39.00 plus applicable taxes will be billed on or shortly after October 1st. State and local restrictions on tanning frequency apply. This offer requires a 12 month commitment. | Plus applicable taxes. Billed monthly to a checking account. Annual Membership Fee of $39.00 plus applicable taxes will be billed on or shortly after October 1st. Membership can only be used at this location. This offer has no monthly commitment. |

[2]

32.     The Website includes additional telemarketing including the offer of three different membership options including a back to school special at $10.00 a month, and a black card membership at $21.99 a month.

33.     Upon information and belief, Defendant caused similar text messages to be sent to individuals residing within this judicial district.

34.     At no point in time did Plaintiff provide Defendant with his express written consent to

---

[2] www.planetfitness.com/gyms/homestead-fl/offers

be contacted with telemarketing text messages using an ATDS.

35. Plaintiff is the subscriber and sole user of the 7547 Number and is financially responsible for phone service to the 7547 Number.

36. The number (63565) that transmitted the text message is operated by or on behalf of Defendant.

37. The number used by Defendant (63565) is known as a "short code," a standard 5-digit code that enables Defendant to send SMS text messages *en masse*.

38. To send the SMS messages, Defendant used Gleantap, a company that hosts a text messaging platform that permitted Defendant to transmit thousands of automated text messages without any human intervention. In fact, on its website, Gleantap boasts that the user can "use [its] marketing automation platform and customer engagement ideas to scale [their] marketing operations" and "send out text messages & push notifications at the right moment."[3] Gleantap promotes mass marketing on its website, stating "mass text marketing has numerous benefits that make it stand out from other forms of communication."[4]

39. Gleantap's platform offers the ability to "run automated text campaigns …set it and forget it," to "send out bulk SMS campaigns" and to "setup auto-replies for inbound keywords so [the user] always acknowledges texts received from [their[ customers."[5]

40. Gleantap implicitly admits that it is an ATDS subject to the TCPA, stating "consent is very important. For SMS marketing campaigns, it's actually the law. Other than potentially being subject to hefty legal penalties, your brand's image will suffer greatly and you may end up worse off then you started. Thankfully, avoiding this is very simple. Either [have] your subscribers opt-in online

---

[3] https://gleantap.com/
[4] https://gleantap.com/mass-text-marketing-unpacking-the-latest-trend/
[5] https://gleantap.com/text-messages-marketing/

or by sending their code to your short link or prompt them on the initial touch-point to agree to receive messages. *Unless you have their written consent you should never send even one message.*"[6]

41. The Gleantap platform has the capacity to store telephone numbers, which capacity was in fact utilized by Defendant.

42. The Gleantap platform has the capacity to generate sequential numbers, which capacity was in fact utilized by Defendant.

43. The Gleantap platform has the capacity to dial numbers in sequential order, which capacity was in fact utilized by Defendant.

44. The Gleantap platform has the capacity to dial numbers from a list of numbers, which capacity was in fact utilized by Defendant.

45. The Gleantap platform has the capacity to dial numbers without human intervention, which capacity was in fact utilized by Defendant.

46. The Gleantap platform has the capacity to schedule the time and date for future transmission of text messages, which occurs without any human involvement.

47. Additionally, the Gleantap platform has an auto-reply function that results in the transmission of text messages to individual's cellular telephones automatically from the system, and with no human intervention, in response to a keyword (e.g. "STOP") being sent by a consumer, which function was also utilized by Defendant as demonstrated by the text message sent to Plaintiff.

48. To transmit the text messages at issue, Defendant uploaded a list of telephone numbers which are stored by the Gleantap platform on its server.

49. Defendant then created the content of the text messages, selected the telephone numbers to transmit the messages to, and selected a date and time for transmission.

---

[6] https://gleantap.com/8-best-practices-next-business-text-messaging-campaign/

50. In making these selections, Defendant was simply creating a set of instructions that were subsequently executed automatically (i.e. with no human intervention), by the Gleantap platform.

51. The Gleantap platform automatically executed Defendant's instructions in the following order:

(1) The platform retrieved each telephone number from the list of numbers uploaded by Defendant in the sequential order the numbers were listed by Defendant;

(2) The platform then generated each number in the sequential order listed by Defendant and combined each number with the content of Defendant's message to create "packets" consisting of one telephone number and the message content;

(3) Each packet was then transmitted in the sequential order listed by Defendant to an SMS aggregator, which acts as an intermediary between the Gleantap platform, mobile carriers (e.g. AT&T), and consumers.

(4) Upon receipt of each packet, the SMS aggregator transmitted each packet – automatically and with no human intervention – to the respective mobile carrier for the telephone number, again in the sequential order listed by Defendant. Each mobile carrier then sent the message to its customers' mobile telephones.

52. The above execution of Defendant's instructions occurred seamlessly, with no human intervention, and almost instantaneously. Indeed, the Gleantap platform is capable of transmitting thousands of text messages following the above steps in minutes, if not less.

53. Further, the Gleantap platform "throttles" the transmission of the text messages depending on feedback it receives from the mobile carrier networks. In other words, the platform

controls how quickly messages are transmitted depending on network congestion. The platform performs this throttling function automatically and does not allow a human to control the function.

54. The following graphic summarizes the above steps and demonstrates that the <u>dialing</u> of the text messages at issue was performed by the Gleantap platform automatically and without any human intervention:



55. Defendant's unsolicited text message caused Plaintiff actual harm. At the time he received the text message from Defendant, Plaintiff was at work. Plaintiff had to stop what he was doing and read the text message sent to him by Defendant which disrupted his work and his normal daily life. As Plaintiff had already cancelled his membership with Defendant, his receipt of the text message from Defendant was an annoyance. Plaintiff was surprised, aggravated and annoyed by the text message Defendant sent him and was unsure why Defendant was sending him a text message.

## CLASS ALLEGATIONS

### PROPOSED CLASS

56. Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23, on behalf of himself and all others similarly situated.

11

57. Plaintiff brings this case on behalf of the below defined Class:

> **All persons within the United States who, within the four years prior to the filing of this Complaint, were sent a text message using the same type of equipment that was used to text message Plaintiff, from Defendant or anyone on Defendant's behalf, to said person's cellular telephone number, advertising Defendant's services, without the recipients' prior express written consent.**

58. Defendant and their employees or agents are excluded from the Class. Plaintiff does not know the number of members in the Class but believes the Class members number in the several thousands, if not more.

### NUMEROSITY

59. Upon information and belief, Defendant has placed automated calls to cellular telephone numbers belonging to thousands of consumers throughout the United States without their prior express consent. The members of the Class, therefore, are believed to be so numerous that joinder of all members is impracticable.

60. The exact number and identities of the Class members are unknown at this time and can be ascertained only through discovery. Identification of the Class members is a matter capable of ministerial determination from Defendants' call records.

### COMMON QUESTIONS OF LAW AND FACT

61. There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class. Among the questions of law and fact common to the Class are:

> (1) Whether Defendant made non-emergency calls to Plaintiff and Class members' cellular telephones using an ATDS;
>
> (2) Whether Defendant can meet their burden of showing that it obtained prior

express written consent to make such calls;

(3) Whether Defendant's conduct was knowing and willful;

(4) Whether Defendant is liable for damages, and the amount of such damages; and

(5) Whether Defendant should be enjoined from such conduct in the future.

62. The common questions in this case are capable of having common answers. If Plaintiff's claim that Defendant routinely transmits text messages to telephone numbers assigned to cellular telephone services is accurate, Plaintiff and the Class members will have identical claims capable of being efficiently adjudicated and administered in this case.

### TYPICALITY

63. Plaintiff's claims are typical of the claims of the Class members, as they are all based on the same factual and legal theories.

### PROTECTING THE INTERESTS OF THE CLASS MEMBERS

64. Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class and has retained competent counsel. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

### PROCEEDING VIA CLASS ACTION IS SUPERIOR AND ADVISABLE

65. A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each member of the Class resulting from Defendant's wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be

unduly burdened by individual litigation of such cases.

66.     The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another may not. Additionally, individual actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions.

**COUNT I**
**Violations of the TCPA, 47 U.S.C. § 227(b)**
**(On Behalf of Plaintiff and the Class)**

67.     Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

68.     It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system … to any telephone number assigned to a … cellular telephone service …." 47 U.S.C. § 227(b)(1)(A)(iii).

69.     Defendant – or third parties directed by Defendant – used equipment having the capacity to dial numbers without human intervention to make non-emergency telephone calls to the cellular telephones of Plaintiff and the other members of the Class defined below.

70.     These calls were made without regard to whether or not Defendant had first obtained express permission from the called party to make such calls. In fact, Defendant did not have prior express consent to call the cell phones of Plaintiff and the other members of the putative Class when its calls were made.

71.     Defendant has, therefore, violated § 227(b)(1)(A)(iii) of the TCPA by using an automatic telephone dialing system to make non-emergency telephone calls to the cell phones of

Plaintiff and the other members of the putative Class without their prior express written consent.

72. Defendant knew that it did not have prior express consent to make these calls and knew or should have known that it was using equipment that at constituted an automatic telephone dialing system. The violations were therefore willful or knowing.

73. As a result of Defendant's conduct and pursuant to § 227(b)(3) of the TCPA, Plaintiff and the other members of the putative Class were harmed and are each entitled to a minimum of $500.00 in damages for each violation. Plaintiff and the class are also entitled to an injunction against future calls. Id.

74. Because Defendant knew or should have known that Plaintiff and the other members of the putative Class had not given prior express consent to receive its autodialed calls to their cellular telephones the Court should treble the amount of statutory damages available to Plaintiff and the other members of the putative Class pursuant to § 227(b)(3) of the TCPA.

**WHEREFORE**, Plaintiff, Jonnathan Ramos, on behalf of himself and the other members of the Class, prays for the following relief:

a. A declaration that Defendant's practices described herein violate the Telephone Consumer Protection Act, 47 U.S.C. § 227;

b. A declaration that Defendant's violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, were willful and knowing;

c. An injunction prohibiting Defendant from using an automatic telephone dialing system to call and text message telephone numbers assigned to cellular telephones without the prior express consent of the called party;

d. An award of actual, statutory damages, and/or trebled statutory damages; and

e. Such further and other relief the Court deems reasonable and just.

## **JURY DEMAND**

Plaintiff and Class Members hereby demand a trial by jury.

Date: November 16, 2018

| | |
|---|---|
| **HIRALDO P.A.** | **EISENBAND LAW, P.A.** |
| | 515 E. Las Olas Boulevard, Suite 120 |
| *s/ Manuel S. Hiraldo* | Ft. Lauderdale, Florida 33301 |
| Manuel S. Hiraldo Florida Bar | Michael Eisenband |
| No. 030380 | Florida Bar No. 94235 |
| 401 E. Las Olas Boulevard Suite | Email: MEisenband@Eisenbandlaw.com |
| 1400 | Telephone: 954.533.4092 |
| Ft. Lauderdale, Florida 33301 | |
| Email: mhiraldo@hiraldolaw.com | |
| Telephone: 954.400.4713 | |
| | **IJH LAW** |
| | 1200 Brickell Ave. Suite 1950 |
| | Miami, FL 33131 |
| | Ignacio J. Hiraldo |
| | Florida Bar No. 0056031 |
| | Email: IJHiraldo@IJHlaw.com |
| | Telephone: 786.496.4469 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 16, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: */s/ Manuel S. Hiraldo*
Manuel S. Hiraldo, Esq.
HIRALDO P.A.
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, Florida 33301
Florida Bar No. 030380
mhiraldo@hiraldolaw.com
Telephone: 954.400.4713